# MANUEL SAUCEDO LOPEZ, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 16677

February 27, 1989                                    769 P.2d 1276

*Kevin M. Kelly,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City, and *Rex Bell,* District Attorney, *James Tufteland,* Deputy, and *Daniel M. Seaton,* Deputy, Clark County, for Respondent.

# OPINION

*Per Curiam:*

This appeal concerns the murder by torture of a four-year-old child, Jessica. Appellant, Manuel Saucedo Lopez ("Lopez"), was convicted by a jury of the murder and sentenced to death in a separate penalty hearing. After a careful and extended review of the issues, the record, and the briefs and arguments of counsel, we conclude that Lopez was fairly tried, convicted and sentenced; we therefore affirm.

## I.  *THE FACTS*

The testimony adduced at trial, although controverted by Lopez, established a pattern of abuse and torture that eventuated in the merciful demise of the four-year-old child-victim, Jessica, the daughter of Maria Lopez ("Maria") and stepdaughter of appellant, Lopez.

The State's chief witness was Maria. She explained that Jessica was fathered by a man in Tijuana, Mexico, and that the child lived with her in Mexico for the first two years after her birth in 1980. Thereafter, until the early part of November, 1984, Jessica stayed in Tijuana with her maternal grandmother. While the child was in Tijuana, Maria entered the United States illegally and eventually married Lopez in 1982. Maria's aunt and uncle brought Jessica to her mother in November, 1984, informing her that Jessica was a bright child with a bed-wetting problem. Maria was pregnant at the time with her second child by Lopez.

Maria testified that there were no problems initially, but by Thanksgiving Lopez was beating Jessica twice a day with a belt because of the child's incontinence. Thereafter, according to Maria, the stepfather's acts of brutality against the child included: (1) asking Jessica if she knew where the bathroom was, then grabbing her by the hair and dashing her against the toilet bowl; (2) hanging Jessica by her hair with her feet above the floor all night long; (3) stripping her and tying her up in a nearby shed, where, when Maria went to retrieve her, the child protested out of fear that Lopez would hurt her; (4) leaving Jessica in a bathtub filled with cold water for two hours, and afterwards, when she could not stop shivering and would not react, forcing her to drink a half glass of whiskey; when Maria sought to intervene, Lopez shoved her into a door, causing Maria to commence labor; (5) placing Jessica in a tub of extremely hot water and forcing her to remain there with a towel pushed into her mouth to muffle her screams; (6) hanging Jessica in a closet by her hair and forcing the child to eat her own feces because, being tied up, she had no

recourse other than to defecate in her underpants; and (7) the night before Jessica died, trying to force her to get up and walk, and when she was unable to do so, grabbing her by the hair, throwing her against the wall, and striking her with a belt.

Dr. James Clarke, who performed the post-mortem examination on the deceased child, testified that his external findings included: (1) extensive burns about the lower legs, buttocks, perineum and genital area, and an extensive second degree burn involving the right lower leg, extending up to the knee; (2) extensive bruising about the right hip and both arms, in particular numerous small bruises spaced about the right upper arm suggesting forcible grasping by fingers or a hand; (3) a swollen upper lip, a "black eye" appearance around both eyes and several bruises about the forehead; and (4) hair missing from part of the scalp.

Dr. Clarke concluded that the child suffered an extremely painful death resulting from abdominal peritonitis due to a perforated ulcer caused by a state of shock ensuing from the injuries and burns.

Jessica's death first officially became known on January 11, 1985, when a city fireman was dispatched to the Lopez apartment and directed to a bedroom to check on a sick child. Upon ascertaining that the child was dead, the fireman, William Jepson, made inquiry of Lopez concerning the whereabouts of the child's parents and was told, untruthfully, that Lopez did not speak English. Although Maria and the stepfather were both present among a gathering of family and friends, Jepson was told that the child's parents were in Tijuana, Mexico. Eventually, Lopez and Maria were identified as Jessica's parents. Through a police interpreter, both Maria and Lopez told a police detective that Jessica had fallen from a slide. However, within an hour or two later at the detective bureau, Maria said that Lopez was responsible for Jessica's death by beating and burning her. Maria explained that she had gone along with the story about the child falling off the slide because she was afraid the police would deport her to Mexico.

A Spanish-speaking police officer participated as an interpreter during separate interviews with Lopez and Maria. He testified that Maria was distraught and crying as she recounted what Lopez had done to her daughter. The officer indicated that Lopez, on the other hand, showed no remorse and when asked about the child's burns said that after he finished taking a shower he told Jessica to take a shower. Lopez also told the officer that apparently the water was too hot and Jessica came running out and had burned herself. When the officer then asked Lopez what had

happened, Lopez replied that "maybe she slipped." The officer also testified that Lopez had exclaimed in English, "Go ahead and shoot and kill me. I know you want to. I deserve it. I have nothing to live for."

Although we find it unnecessary to recite additional facts from the record, we do note that physical evidence gathered from the apartment and testimony elicited from neighbors tended to support the verdict against Lopez.

## II. *THE ISSUES*

### A. The Guilt Phase

1.  Whether the trial court erred in denying defendant's motion for new trial due to an inadequate reconstructed record for appeal.

There is no dispute that due to the malfeasance of the court reporter there is no trial transcript of the trial proceedings occurring on April 15, 1988. On that date, six witnesses testified on behalf of the defense. As a result of the reporter's failure, Lopez moved the trial court for a new trial.

The testimony of the six witnesses was reconstructed through a combination of notes taken by the two trial counsel for the State and two members of an organization known as Families of Murder Victims who attended the trial. Counsel for Lopez declined to participate. At a hearing for the purpose of reconstructing the record pursuant to NRAP 10(c)[1] and an order of this court, the trial judge reviewed the notes, accepted the tendered supplemental record as a fair representation of the testimony of the six witnesses, and denied the motion for new trial.

In essence, Lopez contends that the reconstructed record is inadequate for this court to fulfill its appellate role and that it was error for the trial court to deny a new trial. Although the reconstructed record may not be ideal, it is amply sufficient to obviate the necessity of a new trial.

---

[1]NRAP 10(c) states:

> If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including his recollection. The statement shall be served on the respondent, who may serve objections or propose amendments thereto within ten (10) days after service. Thereupon the statement and any objections or proposed amendments shall be submitted to the district court for settlement and approval and as settled and approved shall be included by the clerk of the district court in the record on appeal.

Lopez strongly urges us to rely on State v. Moore, 534 P.2d 1124 (N.M. 1975), where the court held that the absence of a trial transcript warranted a new trial.[2] In *Moore,* the trial recorder was unable to produce the record because the trial tapes were inaudible; consequently, the appellate court found itself unable to review the defendant's allegation of error relating to the voluntariness of his confession. However, Lopez's reliance on *Moore* is misplaced as it is readily distinguishable from the instant case. In *Moore,* practically the *entire* record was unavailable to the appellate court, which noted that only a "skeleton transcript" had been filed. 534 P.2d at 1124. Whereas the *Moore* court had virtually no record to review, we have some 1,700 pages of testimony available to us in the record on appeal. Secondly, the *Moore* court noted that because the tapes were inaudible and defense counsel was unable to recall events at trial, the record *could not* be reconstructed.[3] Although Lopez's counsel likewise claims an inability to recall the testimony covered by the missing transcripts, a reconstruction was not only undertaken, but approved by the district court as a "fair representation of the testimony of the witnesses." In fact, the *Moore* court noted that, in considering whether a new trial should be granted for inability to produce a transcript, a factor to consider is whether a substitute or alternative form of record may be had. 534 P.2d at 1125.

In his amended opening brief, Lopez raises a number of objections to the manner in which the record was reconstructed. His primary objection relates to the trial court's failure to authenticate, as assertedly required by NRS 57.015, the trial notes used to reconstruct the missing testimony. There are simply no cases suggesting that such authentication is necessary when a trial court

---

[2]Lopez provides a string of citations to support the claim that the missing transcripts mandate a new trial. However, the cases cited are largely irrelevant: they deal with the equal protection problem raised when the State provides written transcripts to defendants able to pay but denies the same to indigent defendants.

Of marginal relevance is United States v. Workcuff, 422 F.2d 700 (D.C.Cir. 1970). In *Workcuff* the court required a new trial on a finding that the reconstructed record was unacceptable. Importantly, however, the reconstructed record in *Workcuff* was made from the "incomplete hearsay *recollections* of one of the parties" which consisted of notes that were "primarily illegible scrawls." *Id.* at 701-02 (emphasis added). In the instant case, the notes were not recollections but notes taken as the testimony was given; neither is there any problem concerning the legibility of the notes.

[3]Indeed, the State in *Moore* did not even oppose the defendant's motion for a new trial.

is certifying a reconstructed record.[4] It is far from clear that NRAP 10(c) mandates the application of NRS 52.015 (authentication and identification) to attempts to reconstruct the trial record. NRAP 10(c) authorizes the preparation of a statement of the evidence which ". . . statement and any objections or proposed amendments shall be submitted to the district court for settlement and approval and as settled and approved shall be included by the clerk of the district court in the record on appeal."

Lopez suggests that the authors of the contemporaneous trial notes should have been required to take the stand to authenticate their efforts. Although under ordinary circumstances authentication of evidence to which the trial court has no personal knowledge is typical, in the instant case the State was asking the court to certify a reconstructed record which reflected testimony which had *occurred in the presence of the court.* Moreover, at the hearing for reconstructing the record, Deputy District Attorney Dan Seaton, as an officer of the court, identified the contemporaneous trial notes that both he and Deputy District Attorney Ray Jeffers took of the testimony of the defense witnesses. In an affidavit filed with the court in conjunction with the State's opposition to the defendant's motion for a new trial, Eva Collenberger swore that she took notes of the defense witnesses' testimony on April 15, 1985, and attached those notes to her affidavit. All of the aforementioned notes are legible and included in the record on appeal. Consequently, it was unnecessary to call authentication witnesses to the stand in an evidentiary hearing.

Even if this court were to conclude that NRS 52.015 is applicable to NRAP 10(c) proceedings, NRS 52.015(1) specifies that "the requirement of authentication or identification . . . is satisfied by evidence *or other showing* sufficient to support a finding that the matter in question is what its proponent claims" (emphasis added). Hence, the trial court has the discretion to determine whether, by "other showing," the requirement of authentication has been met.[5]

Finally, Lopez contends generally that the reconstructed record is simply inadequate to enable this court to determine whether

---

[4]Lopez relies on Com v. Harris, 379 N.E.2d 1073 (Mass. 1978), as supporting the proposition that an evidentiary hearing must be held when reconstructing the record. However, a close analysis of *Com* reveals that the court suggested general guidelines for the trial court to follow in reconstructing the record and did not mandate an evidentiary hearing.

[5]NRS 52.015(2) provides that examples listed as meeting the requirements for authentication (NRS 52.025-.110) "are illustrative and *not restrictive examples* of authentication or identification. . . ." (emphasis added).

there is sufficient evidence to sustain a conviction of first-degree murder.[6] He claims that the six witnesses were called not to solely attest to his good character, but to present factual evidence regarding the actions of Lopez and Maria preceding Jessica's death and to the physical well-being of Jessica on the various occasions when she was allegedly mistreated by Lopez.

We hold that the reconstructed record is adequate for this court to perform a meaningful appellate review, including a determination concerning the sufficiency of the evidence to sustain the conviction. The following factual findings support the trial judge's conclusion that the reconstructed record was a fair representation of the six witnesses' testimony: (1) there were four separate sets of notes dealing with the same events; (2) all the notes were taken contemporaneously with the testimony; they were not notes of present recollection; (3) the notes were of testimony concerning which the trial judge had personal knowledge; (4) the notes were all favorable to Lopez and detrimental to Maria; and (5) there is little discrepancy or variance between the notes.

We conclude this point with the observation that although Lopez has strenuously argued that the reconstructed record is inadequate to permit a full and fair review of the sufficiency of the evidence to sustain a first-degree murder conviction, his reply brief resorts to the same record to demonstrate to this court why the evidence is insufficient.[7] Thus, without specifying sources of deficiency in the reconstructed record that are prejudicial to his defense, Lopez anomalously relies on its accuracy in supporting his position against the State.

---

[6]To bolster his claim, Lopez correctly observes that none of the notes taken mentions objections—the nature of which he cannot specifically recall—but which he believes he made during the State's cross-examination of the six witnesses. Although the trial judge felt there were no legal issues raised during the testimony of the six witnesses, Lopez challenges the premise with the claim that "[t]he legal issue in these six witnesses' testimony is precisely that there is insufficient evidence as illustrated by the testimony of these six witnesses to sustain a conviction of first degree murder. . . ."

[7]Appellant's defense theory was that Maria caused Jessica's death. In support of his theory, the six witnesses not only testified to appellant's character, but of Maria's relationship to Jessica and Jessica's physical well-being on various days she was allegedly mistreated by Lopez—all of this testimony was detrimental to Maria and highly favorable to Lopez. By extensively quoting from the testimony of three of these witnesses, via the *reconstructed record,* appellant seeks to support his claim that the evidence was insufficient to sustain the first-degree murder conviction. However, contrary to Lopez's claim, the testimony of the six defense witnesses does not demonstrate that the conviction cannot be sustained. What the testimony

The reconstructed record fairly represents the trial testimony occurring on April 15, 1985; the trial court did not err in denying Lopez's motion for new trial.

> 2. Whether reversal is warranted because of uncorroborated accomplice testimony.

Lopez contends that he was prejudiced by the uncorroborated testimony of the victim's mother, Maria, whom Lopez characterizes as an accomplice. NRS 175.291(2) defines an accomplice as

> . . . one who is liable to prosecution, for the *identical offense charged* against the defendant on trial, in the cause in which the testimony of the accomplice is given (emphasis added).

Although Lopez *assumed* that Maria was an accomplice, the State's position at trial was that Maria was not responsible for Jessica's death and that she was not an accomplice in the commission of the crime. Prosecutors have wide discretion in the performance of their duties. *See* Cairns v. Sheriff, 89 Nev. 113, 508 P.2d 1015 (1973). It necessarily follows that NRS 175.291 has no application to the instant case.[8] Moreover, the position taken by Lopez on this issue is undermined by his disavowal of any involvement in brutalizing the victim. Appellant's contention is simply without merit.

> 3. Whether the trial court erred in denying appellant's motion for mistrial.

During the trial, Lopez made a motion for mistrial on the claim that the State had intentionally withheld information alleged to be exculpatory. The information concerns a written report by Ted Salazar, wherein he states, in consultation with Dr. Strauss, a psychiatrist, that Maria has organic brain damage. The report also provides greater detail as to the extent Maria was abused as a child.

---

shows is that there was conflicting evidence presented to the jury. In such event, it is the function of the jury to resolve areas of dispute—not the court. Bolden v. State, 97 Nev. 71, 624 P.2d 20 (1980).

[8]A case on point is Globensky v. State, 96 Nev. 113, 605 P.2d 215 (1980), wherein this court held that NRS 175.291 did not apply where evidence showed without serious contradiction that the defendant's wife, *who was initially held on the same charge* but who testified against the defendant, was not liable to prosecution for the identical crime charged. In the instant case, Maria was initially charged with Accessory to Felony Child Abuse; however, she was never charged with the crime appellant stands convicted of: murder by torture.

Based on a motion for continuing discovery granted to appellant March 28, 1985, Lopez complains that the late receipt of the written report on April 9, 1985, during a trial lunch recess, violates NRS 174.295 and the Supreme Court mandate of Brady v. Maryland, 373 U.S. 83 (1963). The contention is without merit. NRS 174.295 in pertinent part provides:

> . . . if, subsequent to compliance with [a discovery order] and prior to or during trial, a party discovers additional material previously requested or ordered which is subject to discovery or instruction . . . *he shall promptly notify the other parties or attorneys* . . . of the existence of additional material.

The *Brady* Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." 373 U.S. at 87.[9] In following the *Brady* rule, this court has reversed a conviction where the prosecutor *intentionally* failed to disclose a psychiatrist's report. Wallace v. State, 88 Nev. 549, 501 P.2d 1036 (1972).

Although the preceding authority cited by Lopez correctly states the law, application of the particular facts of the instant case to that law supports the district court's denial of the motion for mistrial.

When appellant's March 28, 1985, motion for continuing discovery was granted, counsel acknowledged that the State had already provided most of what had been requested in his motion, and that he had been advised that Maria had been abused as a child. In his request for any additional written reports or statements made by Maria, appellant's counsel was informed by the State that it did not have any reports. On April 9, 1985, during a trial lunch recess, Ted Salazar came to Mr. Jeffers' office, at which time Jeffers asked Salazar if he had any reports. Salazar indicated he had notes from different interviews with Maria; Jeffers requested the notes and immediately delivered copies to appellant's counsel. Thus the notes were received by Lopez at the same time the State obtained them.

However, the notes reveal that Mr. Jeffers was present at a March 24, 1985, psychiatric interview of Maria wherein greater details of Maria's abuse as a child and her potential organic brain

---

[9]In Moore v. Illinois, 408 U.S. 786 (1972), the Supreme Court notes that in applying the *Brady* rule the important factors to consider are "(a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." 408 U.S. at 794-95.

defect were revealed. Lopez contends that Jeffers' failure to promptly convey this information to him constitutes grounds for a mistrial. Although it is questionable whether the information is exculpatory to him,[10] appellant fails to demonstrate that the information was suppressed or intentionally withheld from him. Appellant's only support to this effect is that since the specific information in the notes was not promptly provided when the State learned of it, "it can only be inferred that it was intentionally withheld." The evidence does not support this inference. Prior to the motion for continuing discovery, Jeffers had already informed appellant's counsel that Maria had been abused as a child. Upon learning that Mr. Salazar had notes of his interviews with Maria, Jeffers requested the notes and immediately delivered copies thereof to appellant's counsel.

Mistrial motions are committed to the discretion of the trial court, Reese v. State, 95 Nev. 419, 424, 596 P.2d 212, 216 (1979), and under the facts related, the trial court did not abuse that discretion.

### 4. Whether the trial court erred in denying appellant's motion in limine.

During trial, appellant's counsel moved the court to disallow testimony by Maria of statements made to her by her daughter, Jessica. The motion was properly denied.

First, Lopez argues unpersuasively that NRS 48.075 is inapplicable to this case. NRS 48.075 unambiguously provides that "[e]vidence is not inadmissible solely because it is evidence of transactions or conversations with or the actions of a deceased person." Next, Lopez contends that the statements made by Jessica to Maria do not fall within any hearsay exception. To the contrary, statements Maria testified were made to her by Jessica fall under the excited utterance exception.[11] Maria testified of only two conversations with Jessica regarding physical abuse by Lopez. The first occasion relates to the time Lopez burned Jessica by forcing her to sit in hot water. Right after Lopez left, Maria

---

[10]The information revealed that Maria had been beaten with a horse rope and dragged by her hair. The only evidence that Jessica had been dragged by the hair came from Arturo Montez, who testified that he saw *appellant* drag Jessica by the hair. Even assuming that the information created an inference that Maria was involved in the physical abuse of Jessica, appellant fails to demonstrate how this exculpates him.

[11]NRS 51.095 provides: "A statement relating to a startling event or condition made while the declarant was perceiving the event or condition, or immediately thereafter, is not inadmissible under the hearsay rule."

woke up to Jessica's crying and found her in the tub, at which time Jessica related what Lopez had done to her. The second incident concerns the time when Maria discovered Jessica in the closet with her hands tied and cord tangled in her hair. Maria asked Jessica what happened; Jessica told her she could not go to the bathroom and consequently had a bowel movement in her clothes and that Lopez forced her to eat her own feces. This statement was made within a couple of hours of the event at a time when the child was still tied up in the closet. Under such circumstances, the statements in question are excited utterances. Dearing v. State, 100 Nev. 590, 691 P.2d 419 (1984).

Finally, although Lopez contests the admissibility of Maria's testimony of these statements, he nevertheless, on direct examination, testified to several statements *he* attributed to Jessica. Thus, Lopez endorses the application of NRS 48.075 to his own testimony, but not to Maria's. The motion in limine was properly denied.

5. Whether the trial court erred in refusing to strike certain State exhibits.

The exhibits in question concern an electrical wire, a red and white electrical cord which had been spliced together, and a macrame plant holder. Each of these exhibits were admitted into evidence without objection from appellant's counsel, who now argues that he did not object because it was his understanding that the evidence was being admitted subject to being "tied up." Because, he contends, the items were never identified as instrumentalities used against Jessica, he was entitled to a motion to strike the exhibits.

A review of the record does not support the contention that there was an "understanding between all that certain evidence would be admitted without objection if in fact it was tied up." Apparently, what the prosecutor asked the court was whether he could show certain *photographs* to some of the State's witnesses, prior to calling Detective Wohlers to the stand, to lay the foundation for the admission of the photographs; the discussion was irrelevant with respect to the exhibits. This court has held that as a general rule "the failure to object . . . will preclude appellate consideration." Garner v. State, 78 Nev. 366, 372, 374 P.2d 525, 529 (1962).

Even if we were to accept appellant's interpretation of the prosecutor's statement and conclude that the issue is preserved for appeal, the trial court still did not err. There was other

sufficient relevant evidence shown to permit admission of the exhibits. There was testimony that Jessica had been tied up by cords, and that she had been hung by her hair from a macrame plant holder by the use of cords; the hair expert, Dan Berkabile, testified that hair found on all three exhibits was most likely Jessica's. Consequently, the trial court did not err in failing to grant the motion to strike.

6. Whether the trial court erred in admitting a mannequin during the State's rebuttal.

Lopez contends that the trial court erred in permitting the State to introduce a mannequin (approximately the same height and weight of the child-victim) during its rebuttal phase of the trial. Lopez argues that such evidence did not constitute rebuttal evidence and should have been introduced during the State's case in chief.

Admission of rebuttal evidence is within the discretion of the trial court. *See* Morrison v. Air California, 101 Nev. 233, 699 P.2d 600 (1985). In *Morrison,* a civil case, this court defined rebuttal evidence as "that which explains, contradicts, or disproves evidence introduced by a Defendant during his case in chief." *Id.* at 235-36, 699 P.2d at 602.

The law as applied to the facts of the instant case affirms that the trial court did not abuse its discretion. The court ruled that the evidence was clearly rebuttal evidence because—as shown by the record—it was not until Lopez put on his case that the State was sure of appellant's defense theory that Maria was responsible for Jessica's death. During the time Jessica was abused, Maria was either pregnant, in the hospital delivering a baby, or recuperating after the baby's birth. There was evidence tending to corroborate Maria's testimony that Jessica had been hung by her hair. The State's purpose in introducing the mannequin was to allow the jury members to see for themselves how hard it is to lift a forty-seven pound child over one's head. It was an attempt to contradict appellant's case in chief; such is the very nature of rebuttal evidence. Consequently, appellant's argument lacks merit.

7. Whether the trial court erred in refusing to give supplemental jury instructions.

During the jury deliberations, the jury sent the court two questions:

1. If the defendant had any knowledge of any acts leading to the death of victim, does it constitute "involuntary manslaughter."

2. Does knowledge of torture constitute "first degree murder."

Seeking clarification of their questions, the court sent a note to the jury which read: "Whose knowledge of which do you mean." Shortly thereafter, the jury sent another set of questions:

Your honor:

We the jury request a clarification on points of law.

1. Pertaining to instruction No. 10, involuntary manslaughter, "without due caution and circumspection" would this be synonomous [sic] to "knowledge of?"

2. Does knowledge of torture constitute first degree murder?

In response, the court, upon the agreement of counsel, sent a supplemental instruction to the jury which read:

Mere presence or knowledge of the commission of a crime without any participation by the person with such knowledge will not support a conviction of first degree murder by torture, or involuntary manslaughter.

No further questions were posed to the court. However, despite the lack of further jury inquiries, the next day appellant's counsel proposed two additional supplemental jury instructions. The proposed instructions expanded the answer to the jury's last request by defining "without due caution and circumspection." Although the State proffered no objection, both the prosecutor and the court expressed concern in interrupting the jury almost 24 hours after the last request had been made. Indeed, the judge noted, "I think at this point if we tried to submit these instructions, I think that we are indicating to them that they should be thinking along these lines, and I do think that is invading the province of the jury." The prosecutor was of the opinion that the original supplemental instruction already submitted adequately addressed the primary concern of the jury and the trial judge agreed.

The trial judge also concluded, and we agree, that the jury was primarily concerned with whether knowledge on the part of Lopez that Maria was abusing the child, would make him criminally responsible. This concern, it is submitted, was adequately addressed by the supplemental instruction submitted to the jury. Appellant in effect alleges that without the additional supplemental instructions, "the jury continued their deliberations in total ignorance of the law and in a state of confusion. . . ." The facts

simply do not support this allegation. The trial court properly denied the additional jury instructions.

### 8. Whether the evidence is sufficient to support the verdict of the jury.

Lopez maintains that a rational trier of fact could not have concluded beyond a reasonable doubt that he committed the crime of first-degree murder. He also broadly asserts that from the very onset of the investigation by police, "every conceivable violation of fundamental fairness occurred," supporting this allegation by pointing to all the issues he has raised as though they had been resolved in his favor.

Our review of the record on appeal reveals sufficient evidence to establish guilt beyond a reasonable doubt, as determined by a rational trier of fact. *See* Wilkins v. State, 96 Nev. 367, 609 P.2d 309 (1980). Despite the existence of conflicting evidence, a jury verdict will not be disturbed on appeal where, as here, the verdict is supported by substantial evidence. *See* Bolden v. State, 97 Nev. 71, 624 P.2d 20 (1981).

## B. THE PENALTY PHASE.

### 1. Whether appellant is entitled to a new penalty hearing because of an inadequate reconstruction of the penalty phase record.

This issue will be discussed in some detail because of the serious concerns attached to appellant's contention that this court has been deprived of an accurate and complete penalty record upon which to base a full and fair review of his sentence of death.

Oral argument in this case was held on October 12, 1987. At oral argument, it was determined that because of the professional dereliction of the court reporter, Lucile Fisher, the record on appeal did not include a penalty hearing transcript. As a result, this court concluded that further efforts to reconstruct the penalty hearing record should be pursued.

On October 15, 1987, we ordered the district court to conduct further hearings for the purpose of reconstructing the penalty hearing record. To this end, hearings were held and Stella Butterfield, a highly experienced court reporter, was enlisted to reconstruct a record from Lucile Fisher's notebooks and long-playing tapes. The attorneys involved in the case also assisted.

Unfortunately, the audio tapes provided nothing from the April 22, 1985 penalty hearing. However, Fisher's notebook covering the hearing was located and identified. The notebook was interpreted and translated into English. Butterfield compared the

Lopez trial transcript to Fisher's shorthand notes. From this, a "glossary" or "outline" was created which could then be used to interpret Fisher's penalty hearing notes. The glossary that emerged revealed that Fisher used an offshoot of the original Gregg shorthand called progressive writing, a technique also used by Butterfield. As a result, Butterfield was able to commence the translation process.

The foregoing notwithstanding, punctuation was a major problem. Fisher did not punctuate her shorthand notes. As a result, Butterfield had to provide punctuation based upon her experience and familiarity with courtroom proceedings and decorum.

Butterfield, however, was not without help in her effort to translate the Fisher notebook. First, Fisher herself was able to reconstruct five and a half transcript pages. Second, Frances Holden, a shorthand writer who worked with the courts for thirty years and had also transcribed with Fisher assisted Butterfield. Between Butterfield and Holden, they were able to translate the rest of Fisher's notebook and provide a penalty hearing transcript draft.

Upon completion, the transcript draft was presented to the trial court and subjected to a page by page review. Principally present during the review were Daniel Seaton, Chief Deputy District Attorney, Kevin Kelly, appellant's attorney, and the trial judge. All three were present at the original penalty hearing and all three reviewed the transcript draft and made necessary changes. At the close of the draft review, Butterfield would not certify the transcript but testified that it was "a pretty clear representation of what occurred on that day [April 22, 1985]." After reading the corrected transcript version, the trial judge stated that it appeared to be complete and accurate.

On June 9, 1988, a reconstructed penalty hearing transcript was filed and approved by the trial judge for transmission to this court.

In conjunction with the filing of the reconstructed penalty transcript, appellant filed a supplemental brief. In it, Lopez contends (1) that the reconstructed penalty hearing transcript is insufficient to provide this court with a meaningful basis for review, and (2) that he has been denied due process of law because of the three year transcript preparation delay.

Lopez argues that the reconstructed penalty hearing transcript does not provide sufficient basis for review by this court. As a result, he demands that his death sentence be vacated, that his conviction be reversed, and that this case be remanded for a new trial. For reasons discussed below, we do not agree.

Obviously, meaningful, effective appellate review depends

upon the availability of an accurate record covering lower court proceedings relevant to the issues on appeal. Failure to provide an adequate record on appeal handicaps appellate review and triggers possible due process clause violations. *See* Van White v. State, 752 P.2d 814, 820-821 (Okl.Cr. 1988); State v. Dupris, 373 N.W.2d 446, 448-449 (S.D. 1985); State v. Bolling, 246 S.E.2d 631, 637 (W.Va. 1978).

Turning to the merits of appellant's claim, reconstruction is the procedure followed in most cases unless the appellant can show some specific error or prejudice resulting from the failure to record or preserve trial proceeding records.[12] *See* Butler v. State, 570 S.W.2d 272, 274-275 (Ark. 1978); Craig v. State, 510 So.2d 857, 861 (Fla. 1987); Montford v. State, 298 S.E.2d 319, 321 (Ga.App. 1982); State v. Wright, 542 P.2d 63, 64-65 (Idaho 1975); State v. Dupris, 373 N.W.2d 446, 449 (S.D. 1985); State v. Helmick, 286 S.E.2d 245, 249 (W.Va. 1982).

In this case, the penalty phase transcript has been reconstructed and is adequately fair and accurate to afford this court a sufficient record for appellate review. First, one quarter of the transcript was reconstructed by the original court reporter. Second, a shorthand writer, Frances Holden, familiar with the original reporter's work and style, assisted in the production of the remaining three quarters of the record. Third, attorneys for both sides reviewed the reconstructed transcript, page by page, and made changes. Fourth, Judge Shearing, who was present during the penalty phase, reviewed it and stated that it appeared to be complete and accurate. Finally, our own review of the reconstructed record suggests that the penalty hearing transcript is a reasonably accurate reconstruction of what was said.

Although the record is not without errors and omissions, Lopez has failed to show specifically how such errors and omissions are prejudicial. Specifically, Lopez urges this court to take judicial notice of the alleged fact that the attorney who represented the State generally makes inappropriate and prejudicial

---

[12]The Fifth Circuit holds that where a defendant is represented by new counsel on appeal, the absence of a substantial record, even absent any showing of specific prejudice, is sufficient to mandate reversal. *See e.g.,* United States v. Taylor, 607 F.2d 153, 154 (5th Cir. 1979); United States v. Selva, 559 F.2d 1303, 1305 (5th Cir. 1977). In Van White v. State, 752 P.2d 814, 821 (Okl.Cr. 1988), the court held that a complete stenographic record is required in all capital proceedings. In State v. Perry, 401 N.W.2d 748, 751 (Wis. 1987), the court stated that "whether a particular transcript is sufficient for an appeal is dependent upon the nature of the case, the nature of the claim of error, the passage of time from the date a transcript originally was, or should have been, prepared, and whether the trial was to the court or to a jury."

statements during murder trials and, thus, presumably did the same in this case. Lopez also argues that reconstructing a transcript from an unpunctuated notebook, with an apparent illogical margin system and "clear" omissions is unjust, unfair, and unconstitutional. These allegations, however, are vague and abstract. They fail to specifically demonstrate how Lopez was prejudiced and in what specific, material areas the reconstructed transcript is deficient. Without more, Lopez has failed to demonstrate that the reconstructed penalty hearing transcript is materially less than essentially complete and accurate, as found by the trial judge.

2. Whether Lopez was deprived of due process because of a three-year delay in preparing the trial transcript.

Lopez argues that the trial and penalty hearing transcript preparation delay violated his due process rights and, thus, his conviction should be reversed. This issue is one of first impression in this court. However, other jurisdictions have recognized that a defendant may be denied due process of law where there is an inordinate delay in the appeal process. *See e.g.*, Delancy v. Caldwell, 741 F.2d 1246, 1247 (10th Cir. 1984); United States v. Pratt, 645 F.2d 89, 91 (1st Cir. 1981); Rheuark v. Shaw, 628 F.2d 297, 302 (5th Cir. 1980).

Our review of case law reveals that the courts basically have taken one of two approaches in resolving this issue. The first relies heavily upon the Barker v. Wingo, 407 U.S. 514 (1972), analysis developed to determine issues involving the Sixth Amendment right to a speedy trial. Proponents argue that the reasons for limiting acceptable appellate delay are analogous to the motives underpinning Sixth Amendment speedy trial rights. *Rheuark,* 628 P.2d at 303-304. The *Barker* analysis requires the application and balancing of four factors.[13]

The second approach rejects the speedy trial analogy, looking instead to due process questions of fairness and prejudice. Sands v. Cunningham, 617 F.Supp. 1551, 1566-1567 (D.C.N.H. 1985); State v. Chapple, 660 P.2d 1208, 1225 (Ariz. 1983); United States v. Alston, 412 A.2d 351, 356-357 (D.C. 1980); State v. Hall, 487 A.2d 166, 171 (Vt. 1984). Prejudice is shown if the appellant is able to demonstrate that he is unable to present an adequate appeal because of the delay, or that he will be unable to adequately defend in the event the conviction is reversed and

---

[13]"Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U.S. at 530.

retrial is ordered. *Chapple,* 660 P.2d at 1225-26; *Alston,* 412 A.2d at 356-57; *Hall,* 487 A.2d at 171.

The rationale for rejecting the speedy trial analogy was outlined in *Sands:*

> The purpose of the constitutional guarantee of speedy trial is (1) to prevent undue and oppressive incarceration prior to trial, (2) to minimize anxiety and concern accompanying public accusation, and (3) to limit possibilities that long delay will impair the accused's ability to defend himself. [Citations omitted.] The Sixth Amendment was adopted to assure that one accused of a crime is promptly brought to trial. [Citation omitted.] The purposes of the Sixth Amendment, however, do not apply in the context of an appellate proceeding where the accused has already been convicted of an offense. [Citations omitted.]

617 F.Supp. at 1566. We agree with the reasoning of *Sands* and conclude that the second approach is the better one to be adopted by this court.

As a result, the questions to be resolved in the instant case are whether Lopez has shown that he is unable to present an adequate appeal because of the delay, and whether he will be unable to adequately defend himself should retrial become a reality. Apparently, Lopez does not argue that he is unable to present his case on appeal. Instead, he contends that he has suffered great anxiety while incarcerated during the appellate delay. However, defendant's anxiety during post-conviction incarceration does not violate due process. *See Chapple,* 660 P.2d at 1226; *Alston,* 412 A.2d at 359.

Additionally, Lopez makes the argument that he will be unable to adequately prepare a defense in the event of a retrial. Specifically, he argues that the key witness in the case, his wife and mother of the deceased child, has since allegedly recanted her trial testimony, is now in Mexico, and is unavailable for retrial. The State counters that the absence of the prosecution's key witness would benefit Lopez on retrial. Whether, and to what extent, either side would benefit or suffer from Maria's absence or recantation is speculative.

In our view, the fact that the appellate delay has not prejudiced appellant's ability to fully develop and present his issues, or impaired our duty to review an essentially complete and accurate record, is dispositive of the retrial issue. We have concluded that Lopez was fairly tried and convicted, as revealed by the trial record, and is not entitled to a new trial. Therefore, at this juncture, concerns regarding prejudice upon retrial are of no

relevance. Of course, if review under the federal system results in the prospect of a new trial for Lopez, the present issue concerning the effect of Maria's absence and recantation may assume greater significance. However, for our purposes, we conclude that Lopez was not deprived of his right to due process because of the three-year appellate delay attributable to the malfeasance of the court reporter.

### 3. Whether the death sentence was disproportionate to other cases in the State of Nevada.

The death sentence imposed on Lopez for the torture-murder of four-year-old Jessica was not excessive or disproportionate to the penalty invoked in similar cases in this State, considering both the crime and the defendant.[14] The medical examiner testified that the child's death was slow and painful. Both the age of the victim and the methods of torture to which she was subjected reflect a high degree of depravity and indifference to human suffering. In that regard, this murder is disquietingly reminiscent of the killing in Ybarra v. State, 100 Nev. 167, 679 P.2d 797 (1984). In any event, this court has upheld the death penalty in cases less egregious than appellant's. *See, e.g.,* Hardison v. State, 104 Nev. 530, 763 P.2d 52 (1988); Mazzan v. State, 102 Nev. 69, 733 P.2d 850 (1987); Miranda v. State, 101 Nev. 562, 707 P.2d 1121 (1985); Farmer v. State, 101 Nev. 419, 705 P.2d 149 (1985); Nevius v. State, 101 Nev. 238, 699 P.2d 1053 (1985). Accordingly, appellant's proportionality challenge is without merit. Moreover, our review of the record compels us to conclude that Lopez's sentence was not imposed under the influence of passion, prejudice, or any arbitrary factor.

### 4. Whether the evidence supports the finding of aggravating circumstances.

The jury found that Jessica's murder in the first-degree by Lopez was aggravated by the circumstances of torture and depravity of mind. NRS 200.033(8). The jury also found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances. Our review of the record reveals sufficient evidentiary support for the jury's finding. The incidents leading to the child's demise were neither isolated nor the product of instantaneous acts of rage, at least in those instances when the

---

[14]Because Lopez's crime antedated the amendment of NRS 177.055(2)(d) purporting to abolish the proportionality review requirement, such a review by this court is required. However, we express no opinion as to whether the amendment, effective June 6, 1985, accomplished its intended purpose.

child was made to suffer over prolonged periods that could have been shortened and alleviated by the onset of kinder, cooler passions.

## C. Other Issues

1. Whether the trial court erred in denying appellant's motion for new trial based upon alleged juror misconduct.

Following the penalty phase, appellant's counsel learned that two jurors, during deliberations, revealed that they had been victims of child abuse. The incidents were brought to the attention of the court, which denied an evidentiary hearing request, but instead questioned the jurors. Based on the jurors' response, and in light of the voir dire proceedings before trial, the judge concluded that there had been no misconduct. Lopez thereafter made a motion for a new trial, alleging in effect that the court's inquiry of the two jurors was inadequate, that failure of the jurors to disclose on voir dire that they had been abused as children constituted misconduct, and that the disclosures during the jury deliberations were in effect misconduct per se.[15] The trial court found that there was no misconduct in either voir dire or during jury deliberations and denied appellant's motion. The trial court did not abuse its discretion in denying the motion.

This court has held that where it is claimed that a juror has answered falsely on voir dire about a matter of potential bias or prejudice, "In the final analysis, the determination . . . turns upon whether or not he was guilty of *intentional concealment.* The determination of that question must be left with the sound discretion of the trial court." Walker v. State, 95 Nev. 321, 323, 594 P.2d 710, 711 (1979), (quoting McNally v. Walkowski, 85 Nev. 696, 701, 462 P.2d 1016, 1019 (1969)) (emphasis added). Upon learning that two jurors had been the victims of child abuse, the trial court conducted an in-chambers proceeding wherein the following questions were asked:

Q: Were you the subject of child abuse as a child?

A (Juror B.J.): Yes I was.

Q: And were you aware that there was a crime when you were questioned earlier in the proceedings?

A: I believe it was brought up that that was, that child abuse was a crime. I've read it in the papers, that child abuse

---

[15]This last contention is based on appellant's defense theory at trial that the "abused becomes the abuser." Despite having been abused as children, both jurors during deliberations indicated that they, nonetheless, had not become abusers themselves.

was a crime, but I never associated it to mine until we got into the jury room actually.

Q: Okay. You did answer, in response to one of my questions, I believe, were you ever the victim of a crime, and your answer was no.

A: No. But at that time I didn't associate child abuse to a crime.

. . . .

Q: Were you the subject of child abuse when you were a child?

A (Juror M.D.): Yes, I was. May I explain something, though?

Q: Yes.

A: When I answered the question that you had asked me about being the victim of a criminal crime?

Q: Yes.

A: When I was a child, this wasn't specified as a criminal crime, so I didn't figure that, you know, that was why I answered that way.

Q: Were you deliberately trying to withhold the information?

A: No.

Based on the responses, the trial court concluded that there had been no *intentional* concealment. The preceding dialogue supports this conclusion. Furthermore, appellant's counsel gave no indication to the jury or the court, before or during voir dire, that he would rely upon expert testimony to the effect that Maria was the victim of abuse as a child and was therefore more likely to be an abuser than Manuel Lopez.[16] The facts of the instant case simply do not bear out appellant's allegation that during voir dire there had been *intentional* concealment of information by the two jurors.

Lopez in effect argues that the conduct of the two jurors in deliberations constituted misconduct because they did not accept as correct the defense *theory* that the abused becomes the abuser. Appellant's behavioral theory is hardly a truism. In fact, there was conflicting expert testimony regarding the validity of the defense theory in the context of this case. Jurors are not expected

---

[16]Appellant gave no explanation whatsoever why he never addressed the issue of abuse. In reflecting on this, the trial court in its written opinion convincingly argues:

> It is inconceivable to this court that a defense attorney can deliberately fail to question jurors regarding matters that relate to his defense theory of which only he has knowledge, and then later claim misconduct when a juror is revealed to have a background which might influence his or her reaction to that defense theory.

to lay aside their own observations and experiences in life. Almost all of the reported cases which discuss juror misconduct during deliberations involve either independent research of *objective facts* during deliberations or impermissible outside influence during deliberations. Such limitations on juror misconduct represent sound judicial policy as observed by one court: "It must be, too, that in their deliberations jurors more or less generally recall experiences in their own lives, and if new trials were commonly granted for such a reason there would be no end to litigation." People v. Gabourie, 154 Cal.Rptr. 635, 642 (Cal. 1979), (quoting Casey v. United States, 20 F.2d 752, 754 (9th Cir. 1927)).

The disclosures by the two jurors during deliberations did not constitute misconduct justifying a new trial.

2. Whether the trial court erred in refusing a mistrial based upon allegedly perjured testimony of a key witness for the prosecution.

Ten months after trial, appellant's attorney observed a TV interview of Arturo Montez.[17] The words "Brother of Maria Lopez" were superimposed on the screen. Appellant's attorney contacted the reporter and obtained an affidavit—signed under strong protest—that during the interview Mr. Montez advised her that he was Maria's brother and Jessica's uncle. Montez submitted an affidavit denying he ever told anyone, including the reporter, that he was related to Maria Lopez.

Based on the conflicting affidavits, appellant's counsel concluded that Montez committed perjury at trial. He simply chose to ignore two other possibilities: that the reporter was mistaken or dissembling. In any event, Lopez filed a motion for a new trial. However, at the hearing Lopez proffered no evidence or witnesses, but relied wholly on the reporter's affidavit. Arturo Montez took the stand and in no uncertain terms testified that he was not the brother of Maria Lopez.

At the hearing for a new trial the judge noted: "It defies credulity to think that, as I have reviewed the transcripts, that they—Mr. Lopez was totally ignorant of a brother who was living right down the street for some time and never knew—they never knew each other, that they never spoke. It just doesn't make any sense, that he is the brother or that perjury has been committed on the stand, and therefore I'm going to deny the motion for a

---

[17]Mr. Montez was the state's witness who testified of having seen Lopez grab Jessica by the hair and drag her home. He also testified that Lopez responded "no" and shut the door in Mr. Montez' face when Mr. Montez invited the Lopez family over for Thanksgiving.

new trial." The trial judge was correct; this issue is without merit.

## III. CONCLUSION

We have carefully examined the remaining contentions of error and conclude that they lack merit. Lopez was fairly tried, convicted and sentenced. Therefore, the judgment of the trial court is affirmed.[18]

---

[18]The Hon. Robert E. Rose, Justice, did not participate in the decision of this appeal.