BEAU MAESTAS, Appellant, *v.*
THE STATE OF NEVADA, Respondent.

No. 48295

BEAU S. MAESTAS, Appellant, *v.*
THE STATE OF NEVADA, Respondent.

No. 54080

March 29, 2012                                      275 P.3d 74

*Patti, Sgro & Lewis* and *Anthony P. Sgro* and *Erick M. Ferran*, Las Vegas, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *David J. Roger*, District Attorney, *Steven S. Owens*, Chief Deputy District Attorney, and *Nancy A. Becker*, Deputy District Attorney, Clark County, for Respondent.

# OPINION

By the Court, CHERRY, J.:

Appellant Beau Maestas pleaded guilty to several charges and a jury sentenced him to death for first-degree murder. He subsequently sought a new penalty trial based on allegations of juror misconduct and bias, but the district court denied the motion. In these consolidated appeals, Maestas challenges the judgment of conviction and the order denying the motion for a new trial. We conclude that none of Maestas' claims warrant relief and therefore affirm the judgment and order.

In this opinion, we focus principally on two of Maestas' claims. First, we consider whether NRS 175.556 violates the Eighth Amendment because it allows the district court unfettered discretion to choose between imposing a life-without-parole sentence and impaneling a new jury to determine the sentence when a jury is unable to reach a unanimous penalty verdict. We conclude that NRS 175.556 does not violate the Eighth Amendment because the relevant jurisprudence focuses on whether a capital sentencing scheme sufficiently channels the sentencer's discretion to impose a death sentence and NRS 175.556 does not afford the district court the discretion to impose a death sentence (that determination is left to the new jury, guided by the requirements set forth in NRS 175.554). Second, we consider whether the jury foreperson committed misconduct by expressing her views on the meaning of a life sentence without the possibility of parole based on her special knowledge as a 9-1-1 dispatcher and by lying during voir dire to conceal a bias against Maestas. We hold that the district court did not abuse its discretion by denying the motion for a new trial because no misconduct or bias was proved.

## FACTS AND PROCEDURAL HISTORY

This case involves an attack on two children in a trailer located in the CasaBlanca RV Park in Mesquite, Nevada, resulting in the death of one victim and permanent physical injuries to the other victim. In the early morning hours of January 22, 2003, Officer Bradley Swanson responded to a gruesome scene. Outside the trailer, Officer Swanson found three-year-old Kristyanna Cowan lying in her grandmother's arms. Kristyanna had sustained numerous stab wounds, including a wound to the left side of her head that penetrated midway through her brain, wounds to the right side of her head and left side of her neck that penetrated the jugular vein and caused significant blood loss, and a gaping wound to her back. Although still alive, Kristyanna was unconscious and nonresponsive. Swanson found Kristyanna's 10-year-old sister Brittany Bergeron inside the trailer. She had suffered at least 20 stab

wounds but was still conscious and able to tell Swanson what had happened.

Brittany told Swanson that a male and female in their early 20s had come to the trailer. The male grabbed the girls and put his hand over their mouths. Brittany attempted to fight back by kicking and biting, but the male was too strong and everything "went black."

The girls were transported to the hospital. Kristyanna died a short time later. Brittany survived the attack but was left a paraplegic as the result of a stab wound that cut through her vertebral column, severing her spine.

Information received at the crime scene indicated that the girls' attackers had some connection to a known drug dealer named Desiree Towne. Towne informed the police that several hours before the attacks, Beau Maestas contacted her to arrange a purchase of methamphetamine. When Towne was unable to secure the drugs from her source, Maestas inquired about two individuals who drove a white Firebird with a yellow bumper. Towne determined that Maestas was referring to Tammy Bergeron (Brittany and Kristyanna's mother) and her husband Robert Schmidt. Maestas and Towne found Bergeron and Schmidt at a casino in Mesquite, and Maestas purchased what he believed to be methamphetamine from Bergeron for $125. The substance turned out to be salt. Upon discovering this deception, Maestas and Towne returned to the casino, where Maestas and Schmidt got into an altercation and were escorted from the premises. Based on this and other information, the police issued an attempt-to-locate broadcast to authorities in Arizona, California, Utah, and Nevada. Maestas was apprehended in Utah, along with his sister Monique[1] and his girlfriend, Sabrina Bantam.

Bantam provided a detailed account of the events before and after the attacks that implicated Maestas and Monique. According to Bantam, Maestas and Monique arrived at her home after Maestas' botched drug purchase. They were livid over the counterfeit drugs purchased from Bergeron. Maestas asked Bantam for a knife, which she gave to him.[2] Bantam then accompanied Maestas and Monique to the CasaBlanca RV Park. Maestas parked in the employee parking lot and instructed Bantam to honk the car horn if she saw a white Firebird (Bergeron's vehicle). Maestas exited the car and walked toward the RV Park, leaving Bantam and Monique in the car.

When Maestas returned to the car approximately 10 minutes later, he was upset, complaining that the little girls would not let

---

[1]Brittany identified Monique in a photographic lineup as the female attacker.

[2]Bantam claimed that she believed he needed the knife to cut drugs.

him into the trailer. Monique became angry and accompanied Maestas back to the trailer to assist him in gaining entry. Again, Bantam was instructed to honk the car horn if a white Firebird appeared.

Maestas and Monique returned to the car approximately 10 to 15 minutes later. Maestas' hands and clothing were covered in blood. Bantam drove Maestas and Monique to their grandmother's house to clean up and get their grandmother's car. During the drive, both siblings made incriminating statements. Monique stated that she tried to stab the little girl in the organs and kept stabbing. She said, "I should have sliced the girl's neck then, because I was too scared. I couldn't do it." Maestas commented that he "stabbed the little girl in the head." Maestas, Monique, and Bantam eventually fled to Utah.

Physical evidence also connected Maestas and Monique to the attack. With information obtained from Bantam, police located Maestas' and Monique's bloody clothing and the knives. Blood from both victims was found on the clothing.

Maestas incriminated himself. He told police that he went to Bergeron's trailer to get his money back and perhaps to retaliate against Schmidt by "maybe cut[ting] him or stab[bing] him or whatever," but when he made his way into the trailer, Brittany and Kristyanna began screaming, so he stabbed them. He made similar admissions in a letter to someone named Amy, written while he was incarcerated awaiting extradition to Nevada. In that letter, which was intercepted by jail personnel in Utah, Maestas explained the botched drug deal and admitted that he "fliped [sic] out and killed the lady's youngest daughter and paralized [sic] the older one." In a letter he later wrote to Monique while incarcerated at the Clark County Detention Center, Maestas admitted to "slaughtering those little pigies [sic]," referring to Brittany and Kristyanna, and asked Monique to "knock [Bantam]'s teeth out, kick her lips off, rip her tongue out and wipe your ass with it" when Monique was released from prison.

## The charges and trial

The State charged Maestas with first-degree murder with the use of a deadly weapon, attempted murder with the use of a deadly weapon, and burglary while in possession of a deadly weapon. The State also filed a notice of intent to seek the death penalty, alleging two aggravating circumstances: (1) the murder occurred in the commission of a burglary and (2) the victim was under 14 years of age. After Maestas pleaded guilty to all of the charges, the case proceeded before a jury to determine the sentence to be imposed for the first-degree-murder charge as required by NRS 175.552(1)(b). When the jury was unable to reach a verdict, the

district court declared a mistrial and impaneled a second jury as authorized by NRS 175.556(1).

At the second penalty hearing, the State proceeded on a single aggravating circumstance—Kristyanna's age. The State also presented "other matter evidence," NRS 175.552(3), including the facts and circumstances of the crime and the impact on Brittany of her physical and psychological injuries and the loss of her sister. Regarding the latter, Brittany's foster mother, Judith Himel, testified that when Brittany came to live with her about three years before the trial, Brittany was very apprehensive, needed quite a bit of assistance, and was in a great deal of pain. During the day, Brittany was generally happy, playing with other children, swimming, and going to school. But at night, she was frightened and had difficulty sleeping. She often required a sedative and insisted on having a light and a television on. On Kristyanna's birthday and the date of her death, Brittany releases balloons. Himel testified that Brittany receives counseling and physical therapy. She also related that Brittany is an A/B student, on the honor roll, is active in sports, and is about to enter high school.

In mitigation, Maestas presented six witnesses, including family members, his former school probation officer, and a psychologist, and several letters from relatives and friends. The mitigation case focused on Maestas' youth (he was 19 at the time of the attack), abusive and dysfunctional childhood and relationship with his parents (especially his mother), character and exposure to illegal substances, cognitive functioning, admission of guilt, and remorse.

Maestas' oldest sister, Misty, provided the most compelling testimony concerning Maestas' troubled childhood. Misty related that their father, Harry Maestas, was in prison for murdering several people but apparently received periodic furloughs on the weekends. Misty described Harry as violent and threatening. He physically and emotionally abused Misty and her siblings. For example, when Harry was home on furlough he would wake the children up at 3 or 4 a.m. to conduct "closet checks." If the children's clothes were not hung or folded properly or their shoelaces were not tucked in their shoes, he would beat them. Harry beat Maestas when he was three years old because Maestas could not tie his shoes. According to Misty, their mother, Marilyn Maestas, was an equally bad parent. When Misty and her siblings were young, Marilyn sold drugs, even taking a job as a truck driver to facilitate her drug dealing. Marilyn physically and emotionally abused Maestas. She encouraged Maestas' use of drugs at an early age— he started using marijuana when he was 7 years old—and allowed him to consume hard liquor at the age of 10. Marilyn was present when Maestas started using methamphetamine at age 13. Marilyn was emotionally abusive to Maestas, constantly belittling him and calling him horrible and degrading names. When Maestas returned

home after running away, Marilyn beat him. Marilyn and Harry never displayed any affection toward the children.

Misty described Maestas as a hyperactive child, who was angry and confused by the way their parents treated him. She related positive aspects of Maestas' life: he held a variety of jobs, was very active in sports, and was CPR trained and certified. Finally, Misty testified that she loved her brother very much and that she would maintain a relationship with him if he received a life sentence.

Maestas' stepmother, Linda Maestas, and his stepbrothers, Christopher and Kevin Buckner, testified about the adverse affect that Marilyn had on her son's life, which they witnessed when Maestas would stay with them. At the beginning of Maestas' visits, he was troubled, disobedient, and preoccupied, but in time he relaxed and "would get into school, into sports, and spend time at home watching movies, playing games," acted like a "normal kid," and adjusted well to being in a family. Maestas' disposition would change, becoming sad and withdrawn, when he received telephone calls from Marilyn demanding that he return to her.

Maestas' stepmother and stepbrothers also testified to his good character and their relationships with him. Kevin described Maestas as "always looking out for people," including his family. Linda described Maestas as a "sweet boy" who wanted to please people. She also related that she loved Maestas very much and that she was shocked to hear about his crimes, as Maestas had never displayed violence when he lived with her.

Maestas' toxic relationship with his mother was further illustrated through the testimony of his former school probation officer, Ana Archuleta, who was assigned to Maestas at a high school that he attended in Utah. On their first visit to her office, Archuleta observed that Marilyn and Maestas had a very "volatile relationship." Marilyn was very angry and aggressive and called Maestas derogatory names. Although Archuleta recommended that Marilyn participate in counseling with Maestas, she refused. While under Archuleta's supervision, Maestas was respectful to her and raised his grades. However, in December 2000, Maestas violated his probation by not returning home one night and he was arrested. Marilyn refused to allow Maestas to reside with her, and he was placed with his grandmother in Mesquite, Nevada. Other than seeing Maestas at a court appearance the year before his murder trial, Archuleta had no contact with Maestas after he went to live with his grandmother.

Letters from relatives and friends expressed shock over the crimes, stating that Maestas' actions were out of character for him and that drugs must have influenced his actions. He was described in the letters as polite, respectful, helpful, and friendly.

Psychologist David Schmidt testified to Maestas' cognitive functioning. He opined that Maestas exhibited impaired fluid reason-

ing, which is the capacity to gather information and solve problems. Dr. Schmidt explained that fluid reasoning lessens impulsivity as a person matures and allows a person to understand the consequences of actions and stop impulsive responses. Dr. Schmidt explained that although he supports the death penalty in some cases, he did not here because Maestas was functioning at a level well below his age at the time of the offenses.[3] Dr. Schmidt also opined that Maestas was remorseful for his actions and suggested that Maestas' letters referring to "slaughtering those pigies [sic]" and asking Monique to harm Bantam could be attributed to posturing and bravado.

Maestas made a statement in allocution. He conveyed his remorse, apologized to his and the victims' families, and expressed his horror at his actions.

The jury found that the single aggravating circumstance—Kristyanna's age—had been proven beyond a reasonable doubt. One or more jurors also found several mitigating circumstances: (1) no significant history of prior criminal activity, (2) extreme emotional and physical abuse during childhood, (3) emotional abandonment by parents, (4) lack of any significant positive male role model during childhood, (5) exposure to criminal activity throughout childhood, (6) exposure to illegal and harmful substances throughout childhood, (7) extremely dysfunctional nuclear family, (8) admission of guilt, and (9) expression of remorse.[4] The jury then unanimously found that the "aggravating circumstance outweighs any mitigating circumstance or circumstances"[5] and sentenced Maestas to death.[6] He appealed from the judgment of conviction.

## The motion for new trial

While that appeal was pending, one of the jurors, Rachel Poore, approached defense counsel because she was having second

---

[3]Dr. Schmidt evaluated Maestas at age 22 and determined that he had the fluid reasoning of a 10-year-old child. According to Dr. Schmidt, Maestas' fluid reasoning at the time of the crimes (when he was 19) would have been either the same or worse.

[4]Notably, no juror found his age to be a mitigating circumstance.

[5]We note that the quoted language from the verdict form misstates the weighing calculus set forth in statute. *See* NRS 175.554(3) (providing that jury must determine whether there are mitigating circumstances "sufficient to outweigh the aggravating circumstance or circumstances found"); *see also* NRS 175.554(4). As we recently observed in *Nunnery v. State*, this misstatement is of no consequence in most cases and, in any event, the "error inures to the defendant's benefit." 127 Nev. 749, 776-77 & n.14, 263 P.3d 235, 253-54 & n.14 (2011).

[6]Maestas was sentenced to three terms of 40 to 180 months in prison for the other charges.

thoughts about her verdict and wanted to help Maestas. As a result of that contact, Maestas filed a motion for a new trial based on juror misconduct. The motion relied on Poore's affidavit regarding comments made by jury foreperson Tina Ransom. Poore claimed that Ransom told jurors that (1) she had learned about the sentencing of Nevada inmates through her experience as an emergency dispatcher, (2) Maestas would be released after serving only a few years in prison if he was sentenced to life without the possibility of parole and that she "had seen this happen on numerous occasions" and the parole board would undoubtedly release Maestas, and (3) she personally knew of individuals who had been sentenced to life without the possibility of parole who were "walking the streets with ankle bracelets." The State opposed the motion. The district court conducted an evidentiary hearing. Ten jurors, including Poore and Ransom, testified during the hearing, and an eleventh juror provided a voluntary statement but did not testify. The district court also considered voluntary statements taken by a defense investigator from several of the jurors who testified.

Poore's testimony retreated significantly from her affidavit. She denied two points in the affidavit: (1) that Ransom told the jury that she had special knowledge about sentencing based on her employment and (2) that Ransom suggested that the parole board would undoubtedly release Maestas if he were sentenced to life in prison without the possibility of parole. She also testified that Ransom never commented on what might happen to Maestas if he got a life-without-parole sentence. Poore maintained, however, that Ransom told jurors that she knew of individuals who had received life-without-parole sentences and were released to the streets with ankle bracelets. According to Poore, that general comment was made after the jury's initial nonunanimous vote in favor of the death penalty and a lengthy discussion of mitigation matters that occurred before the jury reached its unanimous verdict. Related to her motivations in contacting defense counsel, Poore acknowledged that the case had consumed her life and she was in counseling because of it. She explained that she wanted to undo her verdict and that she signed the affidavit, which was drafted by Maestas' counsel, to help Maestas. She also admitted that she wrote letters to Maestas shortly after the trial, asking him for forgiveness and indicating that she wanted to get a tattoo of his name.

Ransom denied Poore's allegations. She testified that she never told jurors that she: (1) had special knowledge about sentencing matters based on her job, (2) knew individuals who had received life-without-parole sentences and were released into society with ankle bracelets, or (3) believed Maestas would be released by the parole board if he received a life-without-parole sentence. Ransom testified that she did mention having once read a news story about a man who was awaiting trial and had an ankle bracelet on.

The remaining nine jurors who testified or provided statements gave conflicting accounts. Contradicting the testimony from Poore and Ransom, four jurors (Barker, Morris, Miller, and Schonbrun) recalled that Ransom indicated that she knew about sentencing based on her employment, but only one of them indicated she said that she had "special" knowledge about sentencing and that juror (Barker) contradicted herself on that point. Five other jurors (Colmenares, Stone, Clark, Misch, and Torge) agreed with Poore and Ransom on this point, indicating that they recalled no comments about Ransom having knowledge about sentencing (special or otherwise) based on her employment. The majority of the jurors indicated, consistent with Poore's and Ransom's testimony, that Ransom did not suggest that she had any knowledge about what would happen to Maestas if he received a life-without-parole sentence, but one juror (Morris) testified that Ransom said that Maestas "could be out wearing an ankle bracelet" if he got a life-without-parole sentence, another juror (Barker) understood a comment by Ransom to be implying that the parole board would release Maestas if he got a life sentence even though Ransom did not mention any specific individual,[7] and a third juror (Misch) recalled a general discussion about whether the parole board would release Maestas if he got a life-without-parole sentence but she could not attribute the discussion to any specific juror(s). Although four jurors (Poore, Barker, Morris, and Colmenares) testified that Ransom made generalized comments that she knew of people who had been sentenced to life without parole and been released with an ankle bracelet, several other jurors (Stone, Clark, Misch, Miller, and Torge) could not attribute those comments to Ransom or had no recollection of any such comments, and one juror (Schonbrun) remembered Ransom making a comment about ankle bracelets but could not recall whether it was in the context of life-without-parole sentences.

The jurors who remembered any relevant comments by Ransom generally agreed that the comments occurred during a discussion in which each juror expressed his or her sentiments about the appropriate sentence. That discussion occurred after an initial vote in which a majority of the jurors favored the death penalty. The comments were relatively brief and were made between 20 and 60 minutes before the unanimous vote.

The district court denied the motion for a new trial. Faced with the conflicting testimony and statements, the district court made a number of credibility determinations and factual findings in a

_____

[7]This testimony about what the juror understood Ransom to have meant is arguably inadmissible under NRS 50.065(2), as it appears to reflect the juror's subjective understanding of what Ransom said rather than overt facts that are open to sight and hearing.

written order denying the motion.[8] The district court found that Poore's affidavit and testimony were not credible for three reasons: (1) Poore admitted that much of the affidavit prepared by defense counsel was inaccurate, (2) Poore had an emotional attachment to Maestas, and (3) Poore "admitted [her] desire to undue [sic] the death sentence to make peace with her religious beliefs." The court then made the following findings regarding the allegations in Poore's affidavit: (1) Ransom commented on her general knowledge about sentencing of the type any juror would have from life experience but she never used the term "special knowledge"; (2) considering the conflicting testimony, there was insufficient evidence that Ransom indicated she had special knowledge of sentencing of inmates in Nevada based on her experience as an emergency dispatcher; (3) Ransom did not suggest that she had any special knowledge about Maestas or the case beyond what was presented in court; (4) the allegation that Ransom commented that Maestas would serve only a few years in prison and then be released to society if sentenced to life without parole was untrue and "any remark about what might happen to Maestas in the future was purely hypothetical speculation, not a factual statement, and that it is inadmissible for any purpose under NRS 50.065"; (5) the allegation that Ransom stated that she had seen numerous people with life-without-parole sentences released after serving only a few years in prison was untrue and that "Ransom only made a statement that she had seen or heard of people who received life sentences being released and that no specific information beyond that statement was conveyed to the jury"; (6) Ransom did not state that the parole board would release Maestas and any remarks about the meaning of life-without-parole were vague, were not factual statements as they involved hypothetical speculation, and were inadmissible under NRS 50.065 as evidence of the jury's thought process; and (7) Ransom testified credibly that she did not state that she personally knew of people who had been sentenced to life without parole and had been released to the streets with ankle bracelets; rather, she recounted having read a newspaper story about a man awaiting trial for a murder who was at home with an ankle bracelet and other stories she had heard about people who had received life sentences, been released, and then committed other crimes. On the last point the district court specifically found

---

[8]The district court struck portions of the voluntary statements and testimony that addressed any juror's thought processes or reactions. *See* NRS 50.065(2) (providing that upon inquiry into the validity of a verdict, "[a] juror shall not testify concerning the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith," and that an affidavit or evidence "of any statement by a juror indicating an effect of this kind is inadmissible for any purpose").

that Ransom was credible and the jurors who testified otherwise were not credible.

Based on its findings, the district court concluded that Maestas had not demonstrated voir dire misconduct, bias, or consideration of improper information during deliberations. As to voir dire, the court concluded that Maestas failed to prove that Ransom lied during voir dire about her ability to be fair and impartial and there was no basis for a finding of implied or actual bias. The district court further concluded that the comments made by Ransom were based on life experience and did not constitute extrinsic information; therefore, there was no juror misconduct. And even assuming there was misconduct, the district court further concluded that there was no reasonable probability that it affected the verdict because: (1) the State did not argue extensively that Maestas posed a future danger and instead focused on the cold-blooded attack on two young children to avenge a drug deal that had gone bad, the brutality of the attack, Maestas' attitude and lack of remorse, and the planning involved in the attack; (2) the challenged comments did not involve extrinsic information; (3) the jury carefully considered mitigating evidence; and (4) the alleged misconduct does not involve the weighing of the aggravating and mitigating circumstances. Maestas timely appealed from the district court's order.

## DISCUSSION

As a result of Maestas' guilty plea, the issues in these consolidated appeals are focused entirely on the capital penalty proceedings and the jury's decision to impose a death sentence for the murder charge, not on Maestas' guilt. We start by addressing the constitutional challenge to the statute (NRS 175.556) that allowed the district court to choose between imposing a life-without-parole sentence and impaneling a new jury after the initial jury could not reach a unanimous verdict. We then turn to the issues related to the motion for a new trial. And finally, we address Maestas' remaining claims and our mandatory review of the death sentence under NRS 177.055(2). We conclude that there were no errors that would warrant a new penalty hearing and therefore affirm the judgment of conviction and order denying the motion for a new trial.

### Constitutionality of NRS 175.556

NRS 175.556(1) affords the district court discretion to choose between imposing a life-without-parole sentence and impaneling a new jury to determine the sentence when the jury is unable to reach a unanimous penalty verdict in a case in which the death penalty is sought. Here, the district court elected to impanel a new

jury after the initial jury was unable to reach a unanimous penalty verdict. Maestas argues that the statute violates the Eighth Amendment because it allows the district court unfettered discretion to impose a sentence less than death or expose the defendant to another penalty hearing with the possibility of a death sentence. We disagree.

Maestas relies primarily on the general proposition in the Supreme Court's death-penalty jurisprudence that capital sentencing schemes must channel the sentencer's discretion so that it cannot "wantonly and freakishly impose the death sentence." *Gregg v. Georgia*, 428 U.S. 153, 206-07 (1976) (plurality opinion) (discussing "basic concern of *Furman* [*v. Georgia*, 408 U.S. 238 (1972),]" that death penalty was being applied capriciously and arbitrarily); *see also Godfrey v. Georgia*, 446 U.S 420, 428 (1980) (plurality opinion) (holding that states must avoid "the arbitrary and capricious infliction of the death penalty" by "defin[ing] the crimes for which death may be the sentence in a way that obviates standardless [sentencing] discretion," channeling "the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death" (internal quotations and footnotes omitted)). NRS 175.556(1) does not violate this proscription. By giving the district court the discretion to choose to impanel a new jury to determine the sentence, the statute does not authorize the district court to find a defendant death eligible or impose a death sentence; that determination is made by the newly impaneled jury, which also has the option to impose sentences less than death or life without parole, including sentences of life with the possibility of parole after 20 years or a definite term of 50 years with parole eligibility after 20 years, *see* NRS 200.030(4) (providing sentences for first-degree murder).[9] And the new jury's discretion is guided by the requirements that it find at least one statutory aggravating circumstance, consider mitigating circumstances, and weigh those aggravating and mitigating circumstances, NRS 200.030(4)(a); NRS 200.033; NRS 175.554(2)-(4), consistent with constitutional principles requiring capital sentencing schemes to appropriately channel the sentencer's discretion to avoid imposing death in an arbitrary or capricious manner. *See Gregg*, 428 U.S. at 206-07 (concluding that statutory system similar to Nevada's does not violate the Eighth Amendment). We conclude that NRS 175.556(1) is not constitutionally infirm under the Eighth Amendment; therefore, no relief is warranted in this regard.

---

[9]While the death penalty is no longer a risk if the district court chooses to impose a life-without-parole sentence under NRS 175.556(1), the defendant also loses the chance at a sentence that is more favorable than life without parole.

*Motion for a new trial*

Maestas sought a new trial based on (1) alleged improper comments about extrinsic information made by the jury foreperson during deliberations and (2) the jury foreperson's alleged concealment of bias during voir dire. He argues that the district court erred in denying the motion on its merits.[10] We review the district court's decision for an abuse of discretion, and "[a]bsent clear error," we will not disturb the district court's findings of fact. *Meyer v. State*, 119 Nev. 554, 561, 80 P.3d 447, 453 (2003); *see also Valdez v. State*, 124 Nev. 1172, 1186, 196 P.3d 465, 475 (2008).

As we have explained, " '[j]uror misconduct' falls into two categories: (1) conduct by jurors contrary to their instructions or oaths, and (2) attempts by third parties to influence the jury process." *Meyer*, 119 Nev. at 561, 80 P.3d at 453. The allegations in this case—considering information not admitted during trial and lying during voir dire to conceal bias—fall within the first category. *See id.* To obtain a new trial based on juror misconduct, the defendant must establish that (1) misconduct occurred and (2) the misconduct was prejudicial. *Id.* at 563-64, 80 P.3d at 455.

*Consideration of extraneous information*

Maestas asserts that the jury foreperson tainted the jury deliberations with extraneous information by telling the jury that she had special knowledge about matters related to sentencing. There are two problems with Maestas' argument. First, the district court

---

[10]Maestas also argues that the district court erred in striking portions of the juror statements and testimony under NRS 50.065(2), which provides that a juror is precluded from testifying "concerning the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict" or "concerning the juror's mental processes in connection therewith." Having carefully reviewed those portions of the jurors' statements and testimony that were struck, we conclude that Maestas is not entitled to relief. Most of the information was properly struck under NRS 50.065(2). *Meyer v. State*, 119 Nev. 554, 563, 80 P.3d 447, 454 (2003) ("Juror affidavits that delve into a juror's thought process cannot be used to impeach a jury verdict and must be stricken."). The few instances in which the district court may have erred did not prejudice Maestas because the information was not particularly relevant (jurors' statements reciting the four possible sentences the jury could impose) or the jurors were allowed to testify to the same information and the testimony was not struck (Juror Morris' statement that she recalled Ransom stating that Maestas could be released from prison wearing an ankle bracelet if sentenced to life without parole and Juror Misch's statement that she did not recall Ransom stating that Maestas could be released from prison in a few years if sentenced to life without parole but did recall some discussion amongst the jurors along those lines).

considered the conflicting testimony and found that the foreperson did not suggest that she had special knowledge about sentencing in general or about Maestas in particular based on her employment but instead made comments that were based on general knowledge and life experience. The record does not reveal any clear error in those findings (even the juror whose affidavit provided the basis for the motion below testified consistent with those findings). Second, we have indicated that a juror's opinion based on life experience, general knowledge, and specialized knowledge or expertise is not extrinsic information and does not constitute juror misconduct.[11] *Meyer*, 119 Nev. at 570-71 & n.54, 80 P.3d at 459 & n.54 ("The opinion, even if based upon information not admitted into evidence, is not extrinsic evidence and does not constitute juror misconduct."). The juror may not, however, relate "specific information from an outside source, such as quoting from a treatise, textbook, research results, etc." *Id.* at 571, 80 P.3d at 459. Again, the district court found that the foreperson's comments involved her personal opinions and were based on her life experience and general knowledge rather than specific information from an outside source.[12] The district court's determination that Maestas had not demonstrated that the jury considered extraneous information is supported by the record and consistent with our prior decisions in this area.

Maestas spends little time on the possibility of intrinsic misconduct, which on its face may be the more troubling aspect of the allegations: that the foreperson told jurors that she was aware of people who had been sentenced to life without parole but were later released with ankle bracelets. Such comments could suggest

---

[11]Maestas suggests that in some circumstances, information conveyed to a jury based on a juror's special knowledge may result in the consideration of improper extraneous information. He discusses our decision in *State v. Thacker*, 95 Nev. 500, 596 P.2d 508 (1979), as an example. *Thacker*, however, is distinguishable. That case involved a charge of grand larceny of two calves. *Id.* at 501, 596 P.2d at 508. Although a key fact at issue in the case was the calves' size when they were seized and impounded (the defendants were claiming that the calves that had been seized from them were not the stolen calves), no evidence about the calves' weight or what they had been fed was presented during the trial. *Id.* at 502, 596 P.2d at 509. When the question of the calves' weight and age arose during deliberations, a juror who had been employed at the ranch where the cattle were impounded used his special knowledge to estimate the calves' weight at the time they were impounded, and he conveyed that information to the jury. *Id.* We held that the juror provided unsworn testimony on a disputed fact that was relevant to the determination of the issue before the jury. *Id.* Unlike the juror in *Thacker*, the foreperson in this case did not use specialized knowledge to provide the jury with evidence that was not presented at trial to determine a disputed fact.

[12]To the extent that the foreperson conveyed information that she learned from a news story, it was knowledge she obtained long before the trial and did not involve this case.

that the jury did not follow the court's instructions regarding the meaning of a life-without-parole sentence. This could constitute an improper discussion among jurors that would fall into the realm of intrinsic misconduct.[13] *See Meyer*, 119 Nev. at 562, 80 P.3d at 454 (" '[I]ntra-jury or intrinsic influences involve improper discussions among jurors (such as considering a defendant's failure to testify), intimidation or harassment of one juror by another, or other similar situations . . . .' "). The district court, however, found that the foreperson testified credibly that she made a comment about a person who had been released with an ankle bracelet while awaiting trial, but that she did not make any statements about people who had been sentenced to life without parole and then been released with an ankle bracelet. How other jurors interpreted her comments and the impact that the comments or the jurors' interpretation of those comments had on the jurors' thought processes are not admissible. NRS 50.065(2). Given the conflicting testimony, the district court's credibility determinations, and the evidentiary limitations imposed by NRS 50.065(2), there was no proof of intrinsic misconduct.

### Juror bias

Juror misconduct also includes lying during voir dire and making a decision on the basis of bias. *Meyer*, 119 Nev. at 561, 80

---

[13]We have observed that intrinsic misconduct is difficult to prove because of the restriction on juror affidavits or testimony "that delve into the jury's deliberative process." *Meyer*, 119 Nev. at 565, 80 P.3d at 456. Here, to the extent that the relevant testimony as to what was said during deliberations addressed "overt conduct without regard to the state of mind and mental processes of any juror," it was not subject to NRS 50.065(2). *Id.* at 563, 80 P.3d at 454. In this, we note a difference between NRS 50.065(2) and its federal counterpart: Federal Rule of Evidence 606(b) precludes a juror from testifying "about any statement made or incident that occurred during the jury's deliberations" with an exception for testimony about "extraneous prejudicial information" or "outside influence." NRS 50.065(2) does not include the prohibition against juror testimony "about any statement made or incident that occurred during the jury's deliberations." The Nevada statute is based on the 1969 Preliminary Draft of Rule 606, *Barker v. State*, 95 Nev. 309, 312, 594 P.2d 719, 721 (1979); 27 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6071, at 452-53 & n.74 (2007) (identifying Nevada as one of two states that adopted the version of subdivision (b) employed in the Preliminary Draft), which was rejected in Congress because it was too expansive, *Tanner v. United States*, 483 U.S. 107, 123-25 (1987); 27 Wright & Gold, *supra*, § 6074, at 488 ("Under that approach [endorsed by the drafters of the Preliminary Draft], jurors are prohibited only from testifying as to their mental processes while testimony may be received as to objectively apparent facts or events occurring during deliberations, such as juror statements or conduct."). *See Lamb v. State*, 127 Nev. 26, 44 n.10, 251 P.3d 700, 712 n.10 (2011) (noting that "although NRS 50.065 differs from FRE 606(b) in its phrasing, *Meyer* . . . does not consider the differences significant").

P.3d at 453. ''[W]here it is claimed that a juror has answered falsely on voir dire about a matter of potential bias or prejudice,'' the critical question is whether the juror intentionally concealed bias. *Lopez v. State*, 105 Nev. 68, 89, 769 P.2d 1276, 1290 (1989); *Walker v. State*, 95 Nev. 321, 323, 594 P.2d 710, 711 (1979). And that determination is left to the trial court's sound discretion. *Lopez*, 105 Nev. at 89, 769 P.2d at 1290; *Walker*, 95 Nev. at 323, 594 P.2d at 711; *see McNally v. Walkowski*, 85 Nev. 696, 701, 462 P.2d 1016, 1019 (1969) (juror's intentional concealment of material fact relating to his or her qualification to be fair and impartial may require granting of new trial).

Maestas argues that the jury foreperson concealed a bias against him: she represented during voir dire that she could be fair and consider all sentencing options but in fact did not do so during deliberations, as evidenced by her comments and her alleged disregard of the district court's instruction regarding the meaning of life without parole. The district court found that the jury foreperson had not lied during voir dire about her ability to be impartial and follow instructions, to consider all forms of punishment, and to disregard media coverage about the case, and that nothing in her alleged comments during deliberations indicated that she concealed any pretrial determination regarding sentencing or otherwise harbored any bias against Maestas. The district court's findings on this matter are supported by the evidence, *see Isbell v. State*, 97 Nev. 222, 227, 626 P.2d 1274, 1277 (1981), and we similarly are not persuaded that any of the foreperson's alleged comments during deliberations illustrate that she lied or concealed any bias during voir dire. The voir dire questions posed to the foreperson relating to bias or fairness were perfunctory and vague and did not address her job or its potential effect on her consideration of the case. We are not convinced that the comments attributed to her, which, if made, were made during deliberations after the full development of the evidence, indicate that she lied when answering nonspecific questions about bias and impartiality, which were posed in a vacuum with little reference to any factual underpinnings of the case. Because Maestas failed to show that the jury foreperson intentionally concealed any bias against him, we conclude that the district court did not abuse its discretion by denying the motion for a new trial based on this ground.

*Remaining claims*

Maestas' remaining claims challenge the death sentence based on alleged problems with the charging document and notice of intent to seek the death penalty, the admissibility of evidence pre-

sented during the penalty trial, alleged prosecutorial misconduct, and cumulative error.[14] We conclude that none of these claims warrants relief from the judgment of conviction.

## Challenge to the information

Relying on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), Maestas argues that the information violates the federal constitution because it did not allege that the aggravating circumstance outweighs the mitigating circumstances and the aggravating circumstance was not subject to a probable-cause determination. Although the effect of these Supreme Court decisions is that the aggravating circumstances used to increase the punishment for murder beyond the statutory maximum absent the aggravating circumstances must be submitted to a jury and proved beyond a reasonable doubt, *Apprendi*, 530 U.S. at 490; *Ring*, 536 U.S. at 609, those decisions were based on the Sixth Amendment right to a jury trial and did not address the question of including the same facts in an indictment, *Ring*, 536 U.S. at 598 n.4; *Apprendi*, 530 U.S. at 477 n.3. And although the Court has indicated that in federal prosecutions, facts that must be submitted to a jury under *Apprendi* also must be charged in the indictment, *United States v. Cotton*, 535 U.S. 625, 627 (2002), that requirement stems from the Fifth Amendment right to ''presentment or indictment of a Grand Jury,'' which applies only to the

---

[14]Maestas also raises four arguments that we have rejected in prior cases. First, he urges us to overrule prior decisions holding that neither the Confrontation Clause nor *Crawford v. Washington*, 541 U.S. 36 (2004), apply to evidence admitted at a capital penalty hearing, *see Thomas v. State*, 122 Nev. 1361, 1367, 148 P.3d 727, 732 (2006); *Johnson v. State*, 122 Nev. 1344, 1353, 148 P.3d 767, 773 (2006); *Summers v. State*, 122 Nev. 1326, 1333, 148 P.3d 778, 783 (2006). We decline to do so. In a related argument, Maestas criticizes Nevada's death penalty scheme because it does not require bifurcation of the eligibility and selection determinations in death penalty hearings, although trial courts are not precluded from doing so. We have refused to require bifurcated penalty hearings, *see Johnson v. State*, 118 Nev. 787, 806, 59 P.3d 450, 462 (2002), *overruled on other grounds by Nunnery v. State*, 127 Nev. 749, 772, 263 P.3d 235, 250-51 (2011); *see also McConnell v. State*, 120 Nev. 1043, 1061-62, 102 P.3d 606, 619 (2004), and Maestas raises no novel arguments justifying a fresh look at this matter. Next, Maestas argues that the district court erred by denying his motion to argue last. We rejected a similar argument in *Witter v. State*, 112 Nev. 908, 922-23, 921 P.2d 886, 896 (1996), and Maestas provides no legitimate basis to depart from *Witter*. *See also* NRS 175.141(5) (requiring prosecution to open and conclude argument). Finally, Maestas challenges the death penalty as cruel and unusual punishment under the Eighth Amendment. We have resoundingly rejected that argument, *see Gallego v. State*, 117 Nev. 348, 370, 23 P.3d 227, 242 (2001), *abrogated on other grounds by Nunnery*, 127 Nev. at 776 n.12, 263 P.3d at 253 n.12; *Colwell v. State*, 112 Nev. 807, 814-15, 919 P.2d 403, 408 (1996); *Shuman v. State*, 94 Nev. 265, 269, 578 P.2d 1183, 1186 (1978), and we do so again here.

federal government and has not been incorporated into the Due Process Clause of the Fourteenth Amendment. *See Apprendi*, 530 U.S. at 477 n.3; *Alexander v. Louisiana*, 405 U.S. 625, 633 (1972). Nothing in *Apprendi* and *Ring* altered the long-standing rule that the Fifth Amendment indictment provision does not apply to state prosecutions.[15] Accordingly, we reject Maestas' argument that the federal constitution requires that aggravating circumstances and the balancing of aggravating and mitigating circumstances be alleged in the charging document in a state prosecution.[16] Because the aggravating circumstances are not required to be pleaded in the charging document, it naturally follows that they are not subject to a probable-cause determination.

### Challenges to the notice of intent

Maestas argues that the notice of intent to seek the death penalty violated the constitution on three grounds: (1) the notice-of-intent procedures precluded challenges based on duplicity, multiplicity, and fatal variance; (2) the initial notice of intent did not allege the elements of capital murder; and (3) the amended notice of intent was untimely. We conclude that these arguments lack merit.

Contrary to Maestas' argument, the notice-of-intent procedure does not result in charges for two separate offenses in one count or one offense in two separate counts: capital murder (based on the notice of intent) and non-capital first-degree murder (based on the information). The notice of intent is not a charging document and therefore does not charge a separate offense; rather, it provides notice of the aggravating circumstances that the State alleges and the facts supporting them. The notice of intent and the charging document (either an indictment or information) serve different purposes, and together they do not charge separate offenses in a single count or one offense in several counts.

The notice of intent also was not deficient based on its omission of the weighing of aggravating and mitigating circumstances.

---

[15]Other courts have reached the same conclusion. *E.g.*, *McKaney v. Foreman*, 100 P.3d 18, 20-21 (Ariz. 2004); *Terrell v. State*, 572 S.E.2d 595, 602-03 (Ga. 2002); *People v. McClain*, 799 N.E.2d 322, 335-36 (Ill. App. Ct. 2003); *State v. Hunt*, 582 S.E.2d 593, 602-04 (N.C. 2003); *State v. Laney*, 627 S.E.2d 726, 732 (S.C. 2006).

[16]Such a charging requirement with respect to the balancing of aggravating and mitigating circumstances would place an awkward and unworkable burden on the State at the charging stage given that it generally is the defendant who presents mitigating circumstances, *see Gallego v. State*, 101 Nev. 782, 790, 711 P.2d 856, 862 (1985), and even when the defendant chooses to present no mitigating circumstances, the jury may consider any evidence presented at trial that may mitigate the crime and warrant a sentence less than death, *see Hollaway v. State*, 116 Nev. 732, 743-44, 6 P.3d 987, 995-96 (2000).

Maestas relies on *Ring*, which implicates the Sixth Amendment right to trial by jury as applied to the states through the Fourteenth Amendment's due process requirement. 536 U.S. at 609; *see also Apprendi*, 530 U.S. at 477 n.3. To the extent that due process requires that a defendant receive adequate notice of the aggravating circumstances, the notice of intent required under Nevada law, SCR 250(4)(c)-(d), affords sufficient notice of aggravating circumstances to satisfy that requirement. *Cf. McKaney v. Foreman*, 100 P.3d 18, 21 (Ariz. 2004). Nothing in *Ring* or the due-process notice requirement necessitates notice regarding the weighing of aggravating and mitigating circumstances. *See Ring*, 536 U.S. at 597 n.4.

Finally, the amended notice of intent was not untimely and the State was not required to demonstrate good cause to file the amended notice. SCR 250(4)(d) permits the State to file an untimely "amended notice [of intent] alleging additional aggravating circumstances," upon a showing of good cause, within 15 days "after learning of the grounds for the . . . amended notice." The plain language indicates that the rule applies to amended notices that allege additional aggravating circumstances. Here, the State did not allege any additional aggravating circumstances in the amended notice of intent; rather, the State amended the notice to provide additional factual allegations to support the aggravating circumstances that were alleged in the original notice of intent. We conclude that under the circumstances presented, the State was not required to comply with SCR 250(4)(d).

### *Suppression of police statements*

Maestas contends that his death sentence is unconstitutional because the prosecution used statements that were obtained in violation of his right to remain silent. Maestas moved to suppress his statements in the district court, and the district court denied the motion after hearing argument. He challenges that decision.[17] We will not disturb a district court's determination of whether a defendant invoked his right to remain silent if that decision is sup-

---

[17]Maestas complains about the district court's failure to conduct an evidentiary hearing on his motion to suppress. A review of the record shows that an evidentiary hearing was not warranted because the parties did not appear to dispute the facts surrounding the taking of Maestas' statement and instead disputed the legal issue of whether he exercised his right to remain silent. *See U.S. v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011) ("District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion [to suppress]."), *quoted with approval in Cortes v. State*, 127 Nev. 505, 509, 260 P.3d 184, 187-88 (2011).

ported by substantial evidence. *See generally Harte v. State*, 116 Nev. 1054, 1065, 13 P.3d 420, 427-28 (2000); *Tomarchio v. State*, 99 Nev. 572, 575, 665 P.2d 804, 806 (1983).

Before interviewing Maestas while he was in custody in Utah, Nevada police officers advised him of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). In response to a police officer's invitation to "tell us your side," Maestas stated, "You know I think that I'd like to take the uh silence—but I would say that, ah, the act or crime I did do alone. I didn't have any help." The interrogating officer told Maestas, "If you want to tell us about it and not implicate your sister, that's entirely up to you," to which Maestas stated, "I just did, didn't I." The police officer inquired whether Maestas "want[ed] to tell us how this came about," to which he responded, "I really don't know." The interrogating officer then stated, "Why don't you start from the beginning?" Maestas then explained his involvement in the crimes.

The district court found that Maestas' statement about remaining silent was equivocal and that he did not invoke the protections of *Miranda*. It further found that Maestas was "admonished of his right to remain silent and waived that right." We agree with the district court that nothing in the interview demonstrates the kind of unambiguous invocation of the right to remain silent that is required by the Supreme Court, *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010); rather, Maestas initially indicated that he wanted to invoke his right to remain silent but in the same breath admitted that he alone committed the crimes, and when asked again if he wished to discuss the crimes, Maestas equivocated but then proceeded to make incriminating statements. We further agree with the district court that Maestas' conduct during the interview indicates an implied waiver of the right to remain silent. *Id.* at 382. The district court did not err by admitting Maestas' statement.[18]

### Suppression of letter seized by jail personnel

Maestas argues that the district court erred by refusing to hold an evidentiary hearing on his motion to suppress the letter he wrote to "Amy" while he was in custody in Utah. He argued below that the letter should be suppressed because he had a rea-

---

[18]Maestas challenges the voluntariness of his statement based on his arrest the day before the interrogation, the nature of the crime, his drug use, and his confinement in a Utah jail. Based on our review of the record, we conclude that this claim was not preserved for review. We may review for plain error, *see* NRS 178.602, but considering the totality of the circumstances reflected in the record and the factors outlined in *Passama v. State*, 103 Nev. 212, 214, 735 P.2d 321, 323 (1987), we discern no plain error.

sonable expectation of privacy in correspondence sent from jail and had no notice that his outgoing mail would be confiscated by jail officials. On appeal, Maestas raises the notice issue and also argues for the first time that confiscation of the letter violated his First Amendment rights and was not justified by a legitimate penal interest.

The notice argument lacks merit. At a hearing on the motion, the prosecutor relayed that, according to a Utah jail official, inmates are provided with a handbook that explains that outgoing mail, except communications to attorneys, is subject to monitoring. Maestas denied receiving the handbook. The district court determined that the jail had "a right to monitor [mail]" for security reasons and that Maestas proffered no authority suggesting that he was entitled to notice before his mail was confiscated. We conclude that the district court did not err in this regard.

Maestas failed to raise his First Amendment claim below. That failure leaves us to consider the claim in the context of plain error. *See* NRS 178.602. The claim is not amenable to plain-error review for two reasons.

First, under the circumstances presented, we cannot say that any error is plain because it is not "so unmistakable that it reveals itself by a casual inspection of the record." *Patterson v. State*, 111 Nev. 1525, 1530, 907 P.2d 984, 987 (1995) (internal quotation omitted). For example, because the issue was not raised below, the record is not sufficiently developed for us to determine whether the jail policy regarding outgoing mail is reasonably related to legitimate penal interests. *See Turner v. Safley*, 482 U.S. 78, 89-90 (1987) (discussing factors that are relevant in determining reasonableness of prison regulation). We therefore lack an adequate basis upon which to review this claim. *See Wilkins v. State*, 96 Nev. 367, 372, 609 P.2d 309, 312 (1980) (observing that while this court may consider constitutional issues raised for the first time on appeal, "it will not do so unless the record is developed sufficiently both to demonstrate that fundamental rights are, in fact, implicated and to provide an adequate basis for review").

Second, the alleged error is not "clear under current law." *Gaxiola v. State*, 121 Nev. 638, 648, 119 P.3d 1225, 1232 (2005) (internal quotation omitted). In particular, there does not appear to be a consensus as to whether the exclusionary rule applies to evidence obtained in violation of the First Amendment. *Compare United States v. Cangiano*, 464 F.2d 320, 328 (2d Cir. 1972) (concluding that "where seizure of allegedly obscene materials is not preceded by a procedure which affords a reasonable likelihood that non-obscene materials will reach the public, the proper remedy is the return of the allegedly obscene materials to those from whom they were seized, not suppression of these items at a subsequent obscenity trial"), *vacated on other grounds*, 413 U.S. 913

(1973), *reaffirmed on remand,* 491 F.2d 905 (2d Cir. 1973), *and United States v. Bush,* 582 F.2d 1016, 1021 (5th Cir. 1978) (concluding that in obscenity prosecution appropriate remedy for violation of First Amendment is return of property, not suppression of evidence at trial), *with United States v. Hale,* 784 F.2d 1465, 1469 (9th Cir. 1986) (concluding that magazine that was basis for child pornography and obscenity convictions but not specified in search warrant was improperly seized and subject to exclusion because magazine was arguably protected by First Amendment at time of seizure), *abrogated on other grounds by New York v. P.J. Video, Inc.,* 475 U.S. 868, 875 (1986), *as stated in U.S. v. Weber,* 923 F.2d 1338, 1343 n.6 (9th Cir. 1990), *and State v. Bumanglag,* 634 P.2d 80, 92 (Haw. 1981) (concluding that in prosecution for promoting pornography "the suppression of the seized films as evidence would be the only effective sanction for the relevant infringements of first and fourth amendment freedoms").

### *Prosecutorial misconduct*

Maestas contends that extensive prosecutorial misconduct rendered his penalty hearing unfair. To support his claim, he points to multiple comments the prosecutor made during opening statement and closing argument, which essentially fall into four categories of claimed misconduct: (1) Golden Rule arguments, (2) appeals to passion and prejudice, (3) prosecutor's expression of personal opinion, (4) Maestas' failure to express remorse, and (5) holiday arguments. A prosecutor's improper comments during a capital penalty hearing are prejudicial when they so infect the proceedings with unfairness as to make the results of the proceeding a denial of due process. *Blake v. State,* 121 Nev. 779, 796, 121 P.3d 567, 578 (2005); *Thomas v. State,* 120 Nev. 37, 47, 83 P.3d 818, 825 (2004). Alleged improper statements should be considered in context. *Browning v. State,* 124 Nev. 517, 533, 188 P.3d 60, 72 (2008). And because Maestas failed to object to all but one of the challenged statements, his claims are reviewed for plain error affecting his substantial rights. NRS 178.602; *Valdez v. State,* 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008); *Gallego v. State,* 117 Nev. 348, 365, 23 P.3d 227, 239 (2001), *abrogated on other grounds by Nunnery v. State,* 127 Nev. 749, 776 n.12, 263 P.3d 235, 253 n.12 (2011). We have carefully reviewed each claim of unpreserved prosecutorial misconduct and conclude that Maestas has not demonstrated plain error affecting his substantial rights. With respect to the preserved challenge, we agree that the prosecutor improperly suggested that Maestas' true reason for pleading guilty was to avoid a lengthy trial that would reveal the details of the crime because the argument referenced matters not in evidence.

Nevertheless, the error was harmless considering the brevity of the comment in a lengthy closing argument and the overwhelming evidence supporting the death sentence.

### Cumulative error

Maestas argues that cumulative error rendered his penalty hearing unfair. "The cumulative effect of errors may violate a defendant's constitutional right to a fair trial even though errors are harmless individually." *Hernandez v. State*, 118 Nev. 513, 535, 50 P.3d 1100, 1115 (2002). Although Maestas' penalty hearing was not free from error, no error considered individually or cumulatively rendered his trial unfair. The quantity and character of any error committed is insignificant when juxtaposed to the overwhelming evidence supporting the death sentence in this case.

### Mandatory review of the death penalty

NRS 177.055(2) requires that this court review every death sentence and consider:

> (c) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
> (d) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
> (e) Whether the sentence of death is excessive, considering both the crime and the defendant.

#### The evidence sufficiently supports the aggravating circumstance

The jury found that Kristyanna was under 14 years of age when she was murdered, which is an aggravating circumstance under NRS 200.033(10). Because the evidence shows that Kristyanna was three years old when she was murdered, the aggravating circumstance was proven beyond a reasonable doubt.

#### The death sentence was not imposed under the influence of prejudice, passion, or any arbitrary factor

It is difficult to imagine a more horrendous killing than Kristyanna's. But nothing in the record indicates that the jury acted under any improper influence in imposing a death sentence for that killing. In fact, the special verdict reflects a deliberate and thoughtful jury, as one or more jurors found nine mitigating circumstances related to Maestas' troubled childhood, his lack of a prior criminal record, his admission of guilt, and his remorse. Therefore, we conclude that the death sentence was not imposed under the influence of prejudice, passion, or any arbitrary factor.

*The death sentence is not excessive*

When considering whether the death sentence is excessive, we ask whether "the crime and defendant before [the court] on appeal [are] of the class or kind that warrants the imposition of death?" *Dennis v. State*, 116 Nev. 1075, 1085, 13 P.3d 434, 440 (2000). The evidence shows that Maestas got a knife and drove to the trailer park bent on getting revenge for being duped out of $125 in a drug deal with Kristyanna's mother. He knew that the girls were alone in the trailer and could have left without incident; instead, he returned to the trailer with his sister and used subterfuge to gain entry into the trailer. He then viciously stabbed to death a defenseless three-year-old child. Afterwards, he cleaned up, disposed of the murder weapon and his bloody clothing, and fled the state. Although Maestas expressed remorse at trial and one or more jurors found remorse as a mitigating circumstance, his musings after the crimes showed little empathy for the young victim. The mitigation case paints the picture of a troubled young man who abused controlled substances and is the product of a dysfunctional, sometimes violent upbringing, but who was also described as being polite and friendly and not the kind of person who would commit the crimes that he admitted in this case. That picture is in stark contrast to the one painted by his actions on the night that Kristyanna was stabbed to death and her sister was left a paraplegic and in the immediate aftermath of that night. Despite Maestas' claim that the death penalty is excessive due to inflammatory prosecutorial and jury misconduct, the record simply does not bear that out. Instead, the record supports the conclusion that the crime and the defendant are of the class or kind that warrant the imposition of the death penalty. Accordingly, the death sentence in this case is not excessive.

Having determined that none of Maestas' claims warrant relief and that the death penalty was properly imposed, we affirm the judgment of conviction and the order denying the motion for a new trial.

SAITTA, C.J., and DOUGLAS, GIBBONS, PICKERING, HARDESTY, and PARRAGUIRRE, JJ., concur.